# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DAVID LOPEZ,

        **Plaintiff,**

vs.                                                   No. CIV 02-0303 LH/LCS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        **Defendant.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

**THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse and Remand (Doc. 6), filed July 8, 2002. The Commissioner of Social Security issued a final decision denying Plaintiff's applications for disability insurance benefits and supplemental security income. The United States Magistrate Judge, having considered the Motion, briefs, administrative record, and applicable law, finds that this Motion is not well-taken and recommends that it be **DENIED**.

## PROPOSED FINDINGS

1.      Plaintiff, now forty-eight years old, filed his applications for supplemental security income and application disability insurance benefits on August 26, 1999 and February 29, 2000, respectively, alleging disability commencing on July 1, 1999, due to arthritis, GERD (gastroesophageal reflux disease), and depression. (R. at 49-51; 61; 85; 261-65.) Plaintiff has an eleventh grade education, with past relevant work as an auto detailer and custodian. (R. at 13; 284-85.)

2.      Plaintiff's applications for disability insurance benefits and supplemental security income were denied at the initial level on May 25, 2000, (R. at 24-27), and at the reconsideration

level on November 15, 2000.  (R. at 29-32.)  Plaintiff appealed the denial of his applications by filing

a Request for Hearing by Administrative Law Judge (ALJ) on November 20, 2000.  (R. at 33.)  The

ALJ held a hearing on October 16, 2001, at which Plaintiff appeared and was represented by a non-

attorney representative.  (R. at 272.)  Plaintiff and Pamela Bowen, a vocational expert (VE), testified

at the hearing.  (*Id.*)

       3.      The ALJ issued his decision on November 2, 2001, (R. at 12-20), analyzing Plaintiff's

claim according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v.*

*Sullivan,* 987 F. 2d 1482, 1487 (10th Cir. 1993).  At the first step of the sequential evaluation

process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the filing of

his application.  (R. at 13.)  At the second step, the ALJ determined that Plaintiff had severe

impairments consisting of chronic low back pain, arthritis, major depression with anxiety, and GERD.

(R. at 14.)  At the third step of the sequential analysis, the ALJ found that the severity of Plaintiff's

impairments or combination of impairments had not met or equaled any of the impairments found in

the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-.1599.  (*Id.*)  The ALJ

then found that Plaintiff retained the residual functional capacity to perform simple, non-public light

work activity, with occasional postural limitations and should avoid concentrated exposure to heights.

(R. at 17.)  In light of this RFC, the ALJ determined that Plaintiff was unable to perform his past

relevant work as an auto detailer or custodian.  (R. at 18.)   At step five, using the Medical-

Vocational Guidelines (Grids) as a framework, the ALJ concluded that there were jobs existing in

significant numbers in the national economy that Plaintiff was able to perform.  (R. at 18-19.) Thus,

the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (*Id.*)

       4.      On December 10, 2001, Plaintiff filed a request for review of the ALJ's decision. (R.

at 7-8.)  On February 14, 2002, the Appeals Council denied the request for review.  (R. at 5-6.)

Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review

purposes.   On March 19, 2002, Plaintiff filed this action, seeking judicial review of the

Commissioner's final decision pursuant to 42 U.S.C. §405(g).

**Standard of Review**

5.      The standard of review in this Social Security appeal is whether the Commissioner's

final decision is supported by substantial evidence and whether she applied correct legal standards.

*See Hamilton v. Sec'y of Health and Human Servs,* 961 F. 2d 1495, 1497-98 (10th Cir. 1992).

Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion."

*Andrade v. Sec'y of Health and Human Svcs.*, 985 F. 2d 1045, 1047 (10th Cir. 1993)(*quoting*

*Broadbent v. Harris*, 698 F. 2d 407, 414 (10th Cir. 1983) (*citation omitted*)).  A decision of an ALJ

is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by

other evidence on the record.  *See Gossett v. Bowen*, 862 F. 2d 802, 805 (10th Cir. 1988).

6.      In order to qualify for disability insurance benefits or supplemental security income,

a claimant must establish a severe physical or mental impairment expected to result in death or last

for a continuous period of twelve months which prevents the claimant from engaging in substantial

gainful activity.  *See Thompson v. Sullivan*, 987 F. 2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C.

§ 423(d)(1)(A)).  At the first four levels of the sequential evaluation process, the claimant must show

that he is not engaged in substantial gainful employment, he has an impairment or combination of

impairments severe enough to limit his ability to do basic work activities, and his impairment meets

or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R.

Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§

3

404.1520 and 416.920.   At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience.  *See id.*

**Administrative Record**

7.     On January 26, 1988, Plaintiff was examined at Lovelace Medical Clinic with complaints of insomnia and a "knot" in his stomach. (R. at 133.) Dr. Michael Lentz, M.D. prescribed an antacid and advised Plaintiff to follow up with Dr. Jorge Sedas, M.D., Plaintiff's primary care physician.  (R. at 134.)  On March 22, 1988, Plaintiff complained of ear pain.  (R. at 120.)  Dr. Margaret Vinning, M.D. diagnosed probable seasonal allergy symptoms, with eustachian tube dysfunction.  (*Id.*)

8.     On April 9, 1988, Plaintiff was brought to the Lovelace Emergency Room with complaints of left hip pain secondary to a motor vehicle accident. (R. at 130.)  X-rays revealed a non-displaced basal cervical neck fracture of the left femur.  (*Id.*)  Dr. Edward I. Feil, M.D.  pinned the fracture site and Plaintiff tolerated the procedure very well.  (R. at 116.)  On the second post-operative day, Plaintiff was sent to physical therapy, but expressed suicidal ideation because he "could not stand the pain anymore."  (*Id.*)  Plaintiff was placed on anti-depressants after he tried to harm himself with a razor and a coat hanger.  (*Id.*)  Dr. Feil observed that most of Plaintiff's complaints centered around his financial problems.  (*Id.*)

9.     On April 11, 1988, Plaintiff was referred for physical therapy.  (R. at 128.)  Plaintiff tolerated the process very poorly, with significant crying and complaints of pain and dizziness.  (R. at 129.)  Plaintiff asked the physical therapist "Do you think I'm disabled now? You don't think I'll be able to work anymore, do you?" (R. at 128.)  In the days following the accident, Plaintiff appeared

4

reluctant to improve and stated that he was hoping he did not have to go back to work.  (R. at 127-128.)  On April 16, 1988, Plaintiff was discharged from the hospital on crutches.  (R. at 116;125.)

10.     On April 29, 1988, Dr. Feil observed that Plaintiff's incision was healed and that Plaintiff walked without a noticeable limp.  (R. at 119.)  Dr. Feil told Plaintiff that he would be unable to work for six months.  (*Id.*)  On June 3, 1988, Plaintiff was walking with a noticeable limp.  (R. at 118.)  X-rays showed good bone ossification over the fracture site.  (*Id.*)  Dr. Feil advised Plaintiff that it would be at least four months for the bone to totally heal.  (*Id.*)

11.     On September 19, 1988, Plaintiff reported soreness only with driving and extended periods of walking.  (R. at 115.)  Plaintiff was using a cane and had a very slight limp.  (*Id.*)  X-rays revealed multiple left femoral neck fixation pins unchanged in position, no evidence of ischemic necrosis of collapse of the left femoral head, and no change from June 3, 1988.  (*Id.*)  Dr. Feil released Plaintiff to return to work on October 3, 1988.  (R. at 115.)

12.     On October 27, 1988, Plaintiff was examined at Lovelace after he was "jumped" in Socorro six days before.  (R. at 110.)  Plaintiff was evaluated for head trauma and alleged loss of consciousness secondary to the fight.  (R. at 113.)  X-rays of the skull and cervical spine revealed no fractures or other abnormalities.  (*Id.*)  Plaintiff was advised to be alert for delayed reactions from the head trauma and to follow up with his family practice doctor in four to five days. (R. at 111.)

13.     On June 12, 1990, Plaintiff complained of sneezing, sore throat, runny nose, and dizziness.  (R. at 108.)  On June 16, 1990, Plaintiff complained of a painful right eye.  (R. at 106.) On June 24, 1994, Plaintiff was examined by Dr. Beth E. Kirkhart, M.D. at the Bhasker Medical Clinic, with complaints of left elbow pain due to repetitive moments.  (R. at 227.)  Dr. Kirkhart diagnosed resolving left elbow bursitis and opined that Plaintiff could go back to work.  (*Id.*)  On

February 17, 1998, Plaintiff complained of blisters, swollen lips and tongue, and flu-like symptoms. (R. at 138.)

14.     On March 23, 1999, Plaintiff was seen at the Bhasker Medical Clinic with complaints of hip pain. (R. at 226.)  Plaintiff was prescribed Vicodin.[1]  (*Id.*) On August 2, 1999, Dr. Audrey M. Vega, M.D., a physician at the Bhasker Clinic, treated Plaintiff for complaints of chronic right ankle pain and reflux.  (R. at 223.)  Dr. Vega prescribed Zantac,[2] Propulsid[3] and Vicodin. (*Id.*)  On September 8, 1999, Plaintiff saw Dr. Vega with complaints of an upper respiratory tract infection and GERD.  (R. at 222.)  Dr. Vega prescribed Amoxicillin,[4] switched Plaintiff from Zantac to Tagamet,[5] and continued the Propulsid and Vicodin.

15.     On September 20, 1999, Plaintiff's GERD had not responded to the Tagamet, but had responded somewhat to the Propulsid.  (R. at 221.)  Plaintiff also complained that his Vicodin was

---

[1]  Vicodin in a class of drugs called narcotic analgesics and is used a to relieve pain. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.1371.

[2]  Zantac is in a class of drugs called histamine receptor antagonists and works by decreasing the amount of acid the stomach produces. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.2157.

[3]  Propulsid increases the rate at which the esophagus, stomach, and intestines move during digestion. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.1646.

[4]  Amoxicillin is an antibiotic. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.1201.

[5]  Tagamet works by decreasing the amount of acid the stomach produces. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.1577.

not working and requested Percoset.  (*Id.*)  Dr. Vega prescribed Prilosec[6] and Percoset[7] and continued the Propulsid. (*Id.*)  On October 20, 1999, Plaintiff reported that he had "remarkable relief" with the Prilosec, but needed two Percoset per day to function due to inclement weather and the nature of his job.  (R. at 219.) Plaintiff also reported increased lower back pain and continued left ankle pain.  (*Id.*)

16.     On November 18, 1999, Plaintiff told Dr. Vega that the Percoset was allowing him to work at his car wash shop.  (R. at 218.) Dr. Vega refilled Plaintiff's Percoset and Prevacid. (*Id.*) On December 13, 1999, Plaintiff reported that he was becoming intensely nervous and unable to sleep because his business was decreasing due to the colder weather.  (R. at 216.) The Percoset allowed him to work and the Prevacid was helping his GERD, but the Propulsid and Prilosec were no longer working.  (*Id.*)  Plaintiff appeared somewhat anxious, but was in no apparent distress. (*Id.*)  Dr. Vega prescribed Benadryl,[8] Ativan,[9] Percoset and Prevacid.[10] (*Id.*)

17.     On January 19, 2000, Dr. Vega observed that Plaintiff was markedly depressed

---

[6]  Prilosec works by decreasing the amount of acid the stomach produces. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.2104.

[7]  Percocet is a narcotic pain reliever. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.1374.

[8]   Benadryl is an antihistamine and blocks the effects of the naturally occurring chemical histamine. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.1221.

[9] Ativan affects chemicals in the brain that may become unbalanced and cause anxiety, insomnia, and seizures. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.1211.

[10] Prevacid decreases the amount of acid produced in the stomach. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.2019.

because the pharmacy told him that the Prevacid would make him "shrink." (R. at 214.)  Dr. Vega
reassured Plaintiff that the Prevacid would not cause "shrinking" and diagnosed significant GERD,
major depression with anxiety, and chronic ankle and lower back pain. (*Id.*)  Dr. Vega continued the
Prevacid, Ativan and Percoset. (*Id.*)

18.    On February 17, 2000, Plaintiff stated that he was sleeping well with Ativan and was
eating "much better" with Prevacid, but he still needed Percoset for pain.  (R. at 212.) Dr. Vega
continued the Prevacid, Ativan, and Percoset and also prescribed Zoloft.[11]  (*Id.*)  Plaintiff found that
Restoril[12] was aggravating his anxiety and discontinued it himself.  (*Id.*)

19.    On February 29, 2000, a Social Security Field Office interviewer recounted that
Plaintiff appeared to be in pain during an interview, but after interview, she watched Plaintiff leave
the building and walk to his car in the parking lot.  (R. at 58.)  The interviewer observed that Plaintiff
walked better and faster, that he got into the drivers' side of the car even though his girlfriend
accompanied him to the interview, and that Plaintiff did not have any trouble getting into the car.
(*Id.*)

20.    On March 16, 2000, Plaintiff reported to Dr. Vega that he still had significant pain
when trying to wash vehicles and had self-discontinued the Zoloft because it was not working.  (R.
at 211.)  Plaintiff was responding to the Prevacid and had gained five pounds. (*Id.*)  Dr. Vega

----

[11]    Zoloft is a selective seratonin re-uptake inhibitor and is used to treat depression, obsessive-compulsive disorder, panic disorder, post-traumatic stress syndrome and premenstrual disorder. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.2178.

[12]    Restoril is in a class of drugs called benzodiazepines and affects chemicals in the brain that may become unbalanced and cause insomnia or anxiety. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.2161.

prescribed OxyContin[13] and continued the Prevacid and Percoset.  (*Id*.)  On April 14, 2000, Plaintiff

recounted that he had excellent results with the OxyContin and no longer needed Ativan for his

anxiety.  (R. at 210.)  Dr. Vega continued the OxyContin, Percoset and Prevacid.  (*Id*.)

      21.     On May 11, 2000, Dr. Eugene P. Toner, M.D. performed a consultative examination.

(R. at 147-153.)  Plaintiff told Dr. Toner that he suffered a fractured hip and ankle in the 1988

accident and that he still had significant pain in his hip.  (R. at 147.)  Plaintiff reported that he had

surgery on his esophagus due to problems with swallowing and persistent chest wall pain due to the

surgery.  (*Id*.)  Plaintiff stated that he was dizzy and tired secondary to his medications and that he

had been diagnosed with "rheumatism."  (*Id*.)  Plaintiff recounted to Dr. Toner that he would try to

clean cars for two to three hours and spend the rest of the day lying down.  (R. at 148.)  Plaintiff

could stand for two hours, sit for two hours, walk for an hour, drive for about twenty minutes, and

lift up to forty pounds, bu that he needed to lie down for about 45 minutes four times a day.  (*Id*.)

Plaintiff reported that he last worked in 1997. (*Id*.)

      22.     Dr. Toner observed that Plaintiff moved in a jerky fashion and held himself very stiffly.

(R. at 148.)  Plaintiff had problems following directions and had a very flat affect. (*Id*.)  Plaintiff

walked with his knees bent and favored his left leg. (*Id*.)  Cervical range of motion was 60 degrees

on the right and 40 degrees on the left.  (*Id*.)  Thoracic rotation was five degrees right and lumbar

range of motion was full.  (*Id*.)  Hips were fully flexed on the right and ten degrees on the left,

abduction was 30 degrees on the right and  and 20 degrees on the left, abduction was full on the right

an 10 degrees on the left.  (R. at 149.)

---

[13]  Oxycontin is a narcotic pain reliever used to treat moderate-to-severe pain. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.2037.

23.     Plaintiff had full range of motion in his knees and right ankle and a limited range of motion in his left ankle. (R. at 149.)  There was no evidence of any sensory loss or atrophy. (*Id.*)  Deep tendon reflexes were normal. (*Id.*)  Plaintiff had a thoracotomy scar on his right chest and a scar over his left hip. (*Id.*)  X-rays of the left hip showed four cortical screws from the greater trochanter into the femoral head. (R. at 149.)  The joint space was well-maintained and the screws appeared to be in satisfactory position. (*Id.*)

24.     Dr. Toner diagnosed internal fixation of the left hip, with no evidence of any degenerative joint disease, marked lack of effort on examination, and problems with dysphagia with no specific diagnosis available. (R. at 149.)  In Dr. Toner's opinion, Plaintiff's presentation was excessive in light the physical findings. (R. at 150.)  Although there was evidence of some kind of surgery to the left chest, Dr. Toner found no medical indication of any pathology as far as the esophagus was concerned. (*Id.*)  Dr. Toner observed that Plaintiff's range of motion was inconsistent with his musculature and his x-rays, making it very difficult to determine exactly was Plaintiff was capable of doing. (*Id.*)  With this caveat, Dr. Toner opined that Plaintiff was able to lift 25 to 30 pounds, stand and walk for four hours per day, that there was restriction on Plaintiff's ability to sit and use his upper extremities. (*Id.*)

25.     On May 16, 2000, Plaintiff reported that his back pain had become more severe, but that he was still detailing automobiles. (R. at 209.)  Plaintiff was able to sleep and had excellent results with the Prevacid, was in no apparent distress with intact sensorium, but he moved in a guarded manner. (*Id.*)  Dr. Vega diagnosed chronic low back pain, right hip pain, right ankle pain and major depression with anxiety and continued Plaintiff's medications. (*Id.*)

26.     On May 23, 2000, Dr. Edward S. Bocian, Jr., M.D., completed a Physical Residual

10

Functional Capacity Assessment.  (R. at 178-185.)  Dr. Bocian determined that Plaintiff was able to lift twenty pounds occasionally and ten pounds frequently, stand for about six hours in an eight hour workday, sit for about six hours in an eight hour workday, retained an unlimited ability to operate hand and foot controls, and that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl.  (R. at 179.)  Dr. Bocian found that Plaintiff had no manipulative, visual, or communicative limitations, and that his only environmental limitation avoidance of concentrated exposure to heights.  (R. at 182.)  Dr. Bocian concluded that the severity of Plaintiff's symptoms was disproportionate to Plaintiff's medically determinable impairments.  (R. at 183.)  On November 14, 2000, Dr. Donald B. Stewart, M.D. concurred in Dr. Bocian's assessment. (R. at 185.)

27.     On August 10, 2000, Dr. Vega noted that Plaintiff was markedly depressed and anxious because he was unable to work due to pain.  (R. at 207.)  OxyContin enabled him to sleep at night and  Percoset alleviated his pain during the day so that he could work in his carwash.  (*Id.*)  Plaintiff was able to eat when he was taking his Prevacid and he was willing to undergo another esophagogastroduodenoscopy. (*Id.*)  Plaintiff was in no apparent distress and was alert and oriented.  (*Id.*)  Dr. Vega diagnosed major depression with anxiety, chronic pain and degenerative joint disease, GERD.  (*Id.*)  Dr. Vega continued the Percoset, OxyContin and Prevacid, and also prescribed Xanax.[14] (*Id.*)

28.     On September 7, 2000, Plaintiff was stable and afebrile, in no apparent distress.  (R. at 205.)  Dr. Vega diagnosed chronic pain in the left ankle with secondary low back pain and esophageal spasms status post corrective surgery.  (*Id.*)  Dr. Vega prescribed Reglan, Prevacid,

---

[14]     Xanax is in a class of drugs called benzodiazepines and affects chemicals in the brain that may become unbalanced and cause anxiety.  WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.1214.

Percoset, and OxyContin. (*Id.*)  On October 6, 2000, Plaintiff stated that the Percoset allowed him to function during the day and that he was opening an auto detailing shop.  (R. at 204.)  Plaintiff reported that he was having spasms at night that awakened him and prevented him from sleeping. (*Id.*) Plaintiff had ongoing depression, but felt better because he was opening the detailing shop. (*Id.*) Plaintiff was able to function and did not require any medication for his mental condition. (*Id.*) Dr. Vega diagnosed chronic left ankle pain, restless leg syndrome and major depression with anxiety. (*Id.*)

29.     On October 19, 2000, Steven Sacks, M.D. performed a consultative psychiatric evaluation.  (R. at 154-159.)  Plaintiff reported that he was hit by a drunk driver in 1988, was in a coma for two weeks and sustained multiple fractures to his hip, ankle, ribs, and shoulder.  (R. at 154.) About six months later he discovered that he had some type of nerve damage that was affecting his stomach.  (*Id.*)  Plaintiff told Dr. Sacks that he had been followed by Dr. Vega as his primary care physician, and had been on Percocet on and off for twelve years, and OxyContin for three years. (*Id.*) Plaintiff stated that he had been evaluated by a psychiatrist after the accident who recommended antidepressants, but Plaintiff refused.  (R. at 155.)  In about February 2000, Dr. Vega had prescribed Zoloft, but Plaintiff found that it did not alleviate his symptoms of depression.  (*Id.*)  Plaintiff reported that he had tried Zantac, Prevacid, Celebrex, and Ativan. (R. at 155.)  Plaintiff told Dr. Sacks that he was taking Ritalin, Restoril, Klonopin[15] and Xanax.  (*Id.*)

30.     Plaintiff recounted that he had been depressed and anxious since his motor vehicle accident.  (R. at 155.)  He experienced episodes of hyperventilation and parathesia around his arms and his head.  (*Id.*)  He was very nervous about leaving the house and being around other people.

---

[15] Klonopin affects chemicals in the brain and is used to treat seizures. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.1586.

(*Id.*)  He rarely left the house except to water his plants.  (R. at 157.)  Plaintiff reported insomnia, nightmares, loss of appetite, memory problems, difficulty concentrating, and suicidal ideation. (R. at 155.)  Plaintiff had no friends, but enjoyed playing with his baby daughter.  (R. at 157-158.)  He relied on his live-in girlfriend to pay bills, shop, prepare meals, and do household chores.  (R. at 158.)  Plaintiff would go to church daily to talk to the priest, but was unable to attend services due to the presence of other people.  (R. at 158.)  Plaintiff did not drink or use illicit drugs and had no family history of substance abuse. (R. at 155.)  Plaintiff reported that his brother, who died in 1988 from itchy arms, may have had depression.  (R. at 156.)  Plaintiff told Dr. Sacks that he was unable to drive.  (R. at 158.)

31.    Dr. Sacks recorded that Plaintiff avoided eye contact and relied heavily on his girlfriend for historical information. (R. at 154.)  Plaintiff appeared uncomfortable and frequently got up during the interview because of back complaints.  (R. at 156.)  Dr. Sacks found no evidence of delusions or hallucinations, no looseness of associations, flight of ideas or blocking. (R. at 157.)  Plaintiff's memory was poor.  (*Id.*)  Plaintiff was able to do basic addition subtraction and division, but was unable to do multiplication.  (*Id.*)  Plaintiff was unable to recite serial sevens and interpret proverbs. (*Id.*)  Plaintiff was unable to identify the governor and could only identify the current president.  (*Id.*)  Plaintiff reported that he was involved in psychotherapy.  (*Id.*)  Plaintiff felt "hopeless" and "worthless."  (R. at 157-158.)

32.    Dr. Sacks diagnosed major depression, possibly single continuous episode present since 1980, panic disorder with agoraphobia, dependent personality disorder, and assigned Plaintiff a GAF of 40.  (R. at 158.)  Plaintiff's GAF score corresponded to serious impairment in social relations and occupational functioning.  (*Id.*)  Dr. Sacks concluded that Plaintiff would have great

difficulty dealing with fellow workers and supervisors because of his panic disorder, difficulty adapting to changes in the workplace due to poor attention and depression, difficulty understanding even simple instruction, maintaining attention and withstanding pressures and stress. (R. at 159-160.) Dr. Sacks opined that Plaintiff would require a payee if he were awarded benefits. (R. at 159.)

33.     On November 2, 2000, Dr. Vega noted that Plaintiff was markedly depressed after his psychiatric evaluation performed in connection with his applications for Social Security benefits, but Plaintiff was managing rather well on Xanax as far as his panic attacks were concerned. (R. at 203.) Plaintiff's GERD was worsening, despite his use of Prevacid, causing him to lose his appetite. (*Id*.) Plaintiff was stable, afebrile, and in no apparent distress. (*Id*.) Plaintiff was alert and oriented, but had a sad affect. (*Id*.) Dr. Vega diagnosed erosive esophagitis, pain, and major depression with anxiety. (*Id*.) Dr. Vega prescribed Prevacid, Zantac, Reglan[16], OxyContin, Percoset, and Xanax. (*Id*.)

34.     On November 13, 2000, Dr. Scott Walker, M.D. completed a Mental Residual Functional Capacity Assessment form. (R. at 160-162.) Dr. Walker determined that Plaintiff's limitations in his abilities to understand and remember detailed instructions, carry out detailed instructions, and to interact appropriately with the general public were markedly limited. (R. at 160-61.) Plaintiff's abilities to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted, to make simple work related decision, to complete a normal workday and workweek without interruptions of psychologically based symptoms and to perform at a consistent pace, to accept instructions and respond appropriately

---

[16]     Reglan increases the rate at which the stomach and intestines move during digestion. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.2034.

to criticism from supervisors, to respond appropriately to changes in the work setting, to travel to unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others at moderately limited.  (R. at 160-161.)  Dr. Walker concluded that Plaintiff's personality traits, anxiety, and depression could cause moderate limitations due to interpersonal sensitivity and reduced adaptability, but that his work history and daily activities indicated that Plaintiff would be able to work in a relatively solitary setting such as custodial work.  (R. at 162.)

35.     Dr. Walker filled in a Psychiatric Review Technique Form on November 13, 2000. (R. at 163-175.)  The review reflected that Plaintiff was suffering from affective anxiety and personality disorders.  (R. at 164-170.)  Dr. Walker found that Plaintiff's mental disorder caused moderate difficulties in maintaining social functioning, concentration persistence and pace, and one or two episodes of decompensation of extended duration.  (R. at 173.)  Dr. Walker noted that Plaintiff had no gross cognitive impairments, psychosis or psychiatric hospitalizations.  (R. at 175.)

36.     On December 18, 2000, Dr. Vega diagnosed Plaintiff with atypical dermatitis over his right lower extremity due to extreme anxiety caused by a houseguest.  (R. at 201.)  Plaintiff had actually been evaluated in the emergency room for the skin rash and had extreme fear that his leg would have to be amputated.  (*Id.*)  Dr. Vega prescribed Erythromycin,[17] Prednisone,[18] Percoset, Phenergan,[19] and Atarax.[20]  (*Id.*)  By December 20, 2000, the rash had subsided and Dr. Vega gave

---

[17]  Erythromycin is in a class of drugs called macrolide antibiotics.WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.1799.

[18]  Prednisone reduces swelling and decreases the body's ability to fight infections. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.1741.

[19]  Phenergan contains Dextromethorphan, a cough suppressant, and Promethazine, an antihistamine. WebMD, *Medical Information; Drugs and Herbs*, available at

a primary diagnosis of atypical dermatitis and a secondary diagnosis of major depression with anxiety. (R. at 200.)  Dr. Vega resumed Klonopin at Plaintiff's request.  (*Id.*)  On December 27, 2000, Plaintiff reported significant relief of the dermatitis, but continued to feel markedly agitated.  (R. at 198)  Dr. Vega prescribed Nystatin[21] for oral thrush, OxyContin, Percoset, Klonopin, and Xanax. (R. at 198-199.)

37.     On December 28, 2000, Dr. Vega wrote that Plaintiff had undergone a Whipple's surgery in 1988 for an esophageal stricture and persistent esophageal symptomology.  (R. at 197). While Plaintiff did not suffer from routine GERD, Dr. Vega explained that he was maintained on maximum doses of Prevacid so that he could eat. (*Id.*)  Plaintiff also was status left hip fracture and had hardware in his left hip and ankle causing chronic pain, especially in inclement weather.  (*Id.*) Dr. Vega recounted that Plaintiff suffered from depression and anxiety, and recently had dermatitis associated with an extreme bout of anxiety.  (*Id.*)  Dr. Vega opined that Plaintiff was unable to work due to his chronic pain, anxiety, and intermittent ability to eat.  (*Id.*)

38.     On May 2, 2001, Dr. Brian Delahoussaye, M.D. evaluated Plaintiff for pain management.  (R. at 237-240.)  Plaintiff stated that he was self-employed in the auto detailing business. (R. at 238.)   Vital signs, neck, chest, lungs, heart, abdomen and extremities were unremarkable.  (*Id.*)  Plaintiff was oriented to person, place, time and purpose and his speech was

---

http://my.webmd.com/content/article/4046.1778.

[20]  Atarax depresses activity in the central nervous system and causes relaxation and relief from anxiety. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.1273.

[21]  Nystatin is an antifungal medication used to treat yeast infections of the mouth. WebMD, *Medical Information; Drugs and Herbs*, available at http://my.webmd.com/content/article/4046.1518.

16

clear without evidence of dysphasia.  (*Id*.)  Deep tendon and pathologic reflexes were normal. (*Id*.)

Cranial nerves and swallow and gag were intact. (*Id*.)  Motor power and dermatomal sensation was

normal. (*Id*.)

39.     Cervical spine exam revealed a functional range of motion in flexion, extension, side

bending and rotation. (R. at 240.)  Cervical impingement maneuvers were negative bilaterlally. (*Id*.)

Thoracolumbar spine exam demonstrated a diminished range of motion, but supine and seated straight

leg raising were negative bilaterally. (*Id*.) Examination of the left ankle revealed a diminished range

of motion with minimal pain. (*Id*.) X-rays showed a normal right ankle, left ankle, lumbar spine, and

normal left hip with retained femoral pins. (R. at 240, 253-256.)  Dr. Delahoussaye diagnosed a

stable old hip fracture with retained hardware, chronic low back pain, status post ankle fracture with

post-traumatic degenerative change, history of panic attacks, and chronic pain syndrome. (R. at 240.)

Dr. Delahoussaye discontinued the Soma,[22] and continued the OxyContin, Percocet, Klonopin,

Prevacid and Xanax, recommended that only one doctor prescribe medication at a time, and

volunteered to take over prescribing Plaintiff's medications. (*Id*.)

40.     On June 8, 2001, Plaintiff returned to Dr. Delahoussaye for re-evaluation. (R. at 236.)

Plaintiff had been intermittently taking himself on and off the medications, so Dr. Delahoussaye

explained to Plaintiff the importance of obtaining medications only from Dr. Delahoussaye and that

Plaintiff was not to use the medications more than Dr. Delahoussaye recommended. (*Id*.)   Dr.

Delahoussaye continued the OxyContin, Percocet, and Klonopin and unsuccessfully tried to get

Plaintiff to take a urine test to make sure he was actually taking the medications. (*Id*.)

---

[22]  Soma is a muscle relaxant. WebMD, *Medical Information; Drugs and Herbs*, available
at http://my.webmd.com/content/article/4046.1618.

41.     On July 6, 2001, Dr. Delahoussaye diagnosed chronic low back pain, refilled Plaintiff's medications, referred him to physical therapy, and did a drug screen to see if Plaintiff was taking any unprescribed medications. (R. at 248.)  On August 3, 2001, Plaintiff reported that he was doing about the same as the prior month, but that his house was being repossessed. (R. at 258.)  Plaintiff was in no apparent distress, alert, cooperative and well oriented, but his affect was somewhat flattened. (*Id.*)  Plaintiff had diffuse tenderness over the paravertebral areas of the thoracolumbar spine. (*Id.*)  Plaintiff used a cane for ambulation.  (*Id.*)  No neurocirculatory deficit was observed.  (R. at 258.)  Dr. Delahoussaye diagnosed chronic low back pain and renewed Plaintiff's medications.  (*Id.*)

42.     On August 30, 2001, Plaintiff reported to Dr. Delahoussaye that he was having breakthrough dyspepsia and that his house was being repossessed. (R. at 257.)  Plaintiff was alert and cooperative and in no apparent distress.  (*Id.*)  He was wearing a lumbar corset, but was not using a cane on that day.  (*Id.*)  Physical examination revealed diffuse tenderness over the lumbar spine and limited range of motion, but no sensory deficits.  (*Id.*)  Dr. Delahoussaye diagnosed chronic low back pain without radiculopathy as well as chronic dyspepsia and continued Plaintiff's medications.  (*Id.*)

43.     Plaintiff wrote that he is unable to work due to residual pain from the accident and depression, and must take medication in order to swallow. (R. at 78-79.)  Plaintiff wrote that he became tired taking his daughter to the park and watering his trees.  (R. at 80.)  Plaintiff stated that was unable to drive when he was on his medication, (R. at 81), but also stated that he was able to drive a short distance. (R. at 92.)  Plaintiff stated that he needed a cane for walking and became dizzy upon standing. (R. at 81.)  Plaintiff was 5'6" and weighed 130 pounds.  (R. at 83.) On March 16, 2000, Plaintiff stated that he had been prescribed Lorazepam, Promethazine, Percoset, Propulsid, Prevacid, Zoloft, and OxyContin. (*Id.*)

18

44.     On August 9, 2000, Plaintiff stated that he was also taking Xanax, Soma, and Temazepam. (R. at 94.) According to Plaintiff, he suffered a nervous breakdown in December 2000. (R. at 99-A.)   Plaintiff wrote that he had also been prescribed Prednisone, Metoclopam and Erythromycin. (R. at 99.) On October 4, 2001, Plaintiff wrote that he was seeing a curandera for his stomach and swallowing problems and taking herbal remedies. (R. at 101.) Plaintiff was always sleepy and was fatigued by the pain. (R. at 85.) Plaintiff wrote that his girlfriend did all the shopping, cleaning and cooking. (*Id*.)

45.     At the October 16, 2001 hearing before the ALJ, Plaintiff stated that his medications made him dizzy and sleepy. (R. at 277.)   ALJ Keohane recessed the hearing for a few minutes so that Plaintiff could consult with his non attorney representative and his girlfriend. (R. at 278.) When they went back on the record, Plaintiff declared that he felt fine and was able to answer questions. (*Id*.) Plaintiff testified that he had been unable to work as an auto detailer for about a year. (R. at 283.) When he worked as a detailer, he finished about two cars a day with the help of his girlfriend. (*Id*.) Most of his customers were family and friends in his hometown of Socorro. (*Id*.)   At the time of the hearing, neither Plaintiff nor his girlfriend were working. (*Id*.)

46.     Plaintiff had been in special education in high school, but dropped out in the twelfth grade and did not obtain his GED. (R. at 284-285.) Plaintiff's biggest problems were forgetfulness and depression. (R. at 285.)   Plaintiff testified that he was able to read and write to a minimal extent, but that he was bad with numbers and had problems counting money. (R. at 286.)   Plaintiff had surgery  because he could not swallow and later had surgery because he was hit by a drunk driver. (*Id*.) Plaintiff was wearing a back brace because his spine hurt and one leg was shorter than the other. (R. at 287.) A doctor did not give Plaintiff corrective footwear, but he made his own footwear. (R.

at 288.) Plaintiff testified that he had pain in his lower spine everyday, especially in the morning and winter. (R. at 288.) The pain medications worked "a little." (*Id*.) The pins in his left hip gave him sharp pains. (R. at 298.)

47.     The fact that he was unable to work made Plaintiff depressed and medication made him more depressed. (R. at 298.) Plaintiff testified that he was able to walk a half a block and had been using a cane for about a year. (R. at 290.) Plaintiff testified that Dr. Vega told him to use the cane. (R. at 291.) Plaintiff testified that he could not sit for very long before he was in pain that he had problems standing, and was unable to climb stairs. (*Id*.) Plaintiff was able to lift about ten or twelve pounds and was unable to kneel or bend over. (R. at 291.)

48.     Plaintiff testified that his girlfriend helped him with personal needs such as getting dressed, but that he was able to take a bath. (R. at 292.) Plaintiff tried to dust, but his girlfriend did the rest of the housework and cooked for him. (R. at 292, 294.) He did not drive because he had lost his license due to lack of insurance. (*Id*.) Plaintiff had no hobbies, but he watched the news on TV. (*Id*.) Plaintiff did not like to go out and liked to hide in the closet twice a day for about fifteen or twenty minutes. (R. at 293.) Plaintiff would take a nap twice day for about forty-five minutes to an hour. (R. at 293-294.)

49.     Plaintiff testified that he did not have any problems with his medications and was able to take his daughter to the park. (R. at 294.) Plaintiff had suicidal thoughts, lacked energy and had panic attacked almost every day. (R. at 295.) Plaintiff testified that he had to drink warm water so that he could eat and was not able to afford additional surgery for his swallowing difficulties. (R. at 296.)

50.     The ALJ asked Pamela Bowen, the VE, to assume a person who could lift or carry

twenty pounds occasionally and ten pounds frequently, sit stand and walk for six hours out of an eight hour day, push and pull, was limited to only occasional climbing, balancing, stooping, kneeling, crouching and crawling, and should avoid heights.  (R. at 297.)  Ms. Bowen testified that such a person could not perform Plaintiff's past relevant work as a auto detailer or custodian/janitor, but could work as a laundry holder, laundry spotter, office helper, shipping and receiving layer, and jewelry preparer/sorter.  (R. at 298.)

51.     In the second hypothetical, the ALJ asked Ms. Bowen to assume a person who could lift twenty-five to thirty pounds occasionally, sit for six hours out of an eight hour day, and stand or walk for four hours out of an eight hour day.  (R. at 298.)  Ms. Bowen testified that such a person would be able to perform the same five jobs.  (*Id*.)  In the third hypothetical, the ALJ fully credited Plaintiff's testimony and asked Ms. Bowen to assume a person who could do no more than occasional walking, with limited sitting and standing, no climbing of stairs, no postural ability, occasionally lifting ten to twenty pounds, no driving, and had marked limitations on concentration and memory.  (R. at 299.)  Ms. Bowen testified that such a person would be unable to work in any job.  (*Id*.)

**<u>Discussion</u>**

52.     Plaintiff contends that the ALJ's findings regarding Plaintiff's mental impairment, Plaintiff's ability to perform the full range of light work, and application of the Grids was legally erroneous and unsupported by substantial evidence.

53.     The ALJ essentially concurred with Dr. Walker's opinion and found that Plaintiff could perform simple, non-public work activities.  (R. at 17.)  Dr. Walker determined that Plaintiff had marked limitations in his ability to understand and remember detailed instructions, carry out detailed instructions, and to interact appropriately with the general public, but that in all other

21

categories Plaintiff was not limited or was only moderately limited.  (R. at 160.) Dr. Walker found

that Plaintiff's personality traits, anxiety, and depression could cause moderate limitations due to

interpersonal sensitivity and reduced adaptability, but that his work history and daily activities

indicated that Plaintiff would be able to work in a relatively solitary setting such as custodial work.

(R. at 162.) Dr. Walker concluded that Plaintiff's mental disorder caused only moderate difficulties

in maintaining social functioning, concentration persistence and pace, and one or two episodes of

decompensation of extended duration, and that Plaintiff had no gross cognitive impairments,

psychosis or psychiatric hospitalizations.  (R. at 173-175.)

54.     Plaintiff contends that the ALJ erred because Dr. Sacks' assessment indicated a more

serious mental impairment than that found by Dr. Walker.  The ALJ is charged with the task of

resolving conflicts in the medical record.  *Richardson v. Perales*, 402 U. S. 389, 399 (1971); *Casias*

*v. Sec'y of Health and Human Servs.*, 933 F. 2d 799, 801 (10th Cir.1991).  The ALJ is responsible

for examining medical source opinions and making the determination on whether claimant meets the

statutory definition of disability.  *See* 20 C. F. R. § 404.1527(e)(1).  The ALJ must base his decision

on the record as a whole, *Castellano v. Secretary of Health & Human Servs.*, 26 F. 3d 1027, 1028

(10th Cir. 1994), and may discount unsupported subjective complaints.  *Diaz v. Sec'y of Health and*

*Human Servs.*, 898 F. 2d 774, 777 (10th Cir. 1990).  The record as a whole establishes that Plaintiff's

depression and anxiety were related to situational stressors and that he was able to function without

medication.  (R. at 204, 207, 210, 214 and 216).  Given the opinion of Dr. Walker and record as a

whole, substantial evidence supports the ALJ's finding that Plaintiff could perform simple, non-public

work activity and the ALJ applied correct legal standards.

55.     Plaintiff asserts that the ALJ erred in finding that he can perform the full range of light

work.  The ALJ found that Plaintiff could perform simple, non-public light work activity with occasional postural limitations and should avoid concentrated exposure to heights.  (R. at 17.)  This finding is supported by the opinions of Dr. Bocian and Dr. Toner, and the record as a whole.

56.     Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds, requires a good deal of walking, standing, or pushing and pulling when sitting is involved.  *See* SSR 83-10; 20 C. F. R. § 404.1567(b), 416.967(a).  Dr. Bocian found that Plaintiff was able to lift twenty pounds occasionally and ten pounds frequently, stand for about six hours in an eight hour work day, sit for about six hours in an eight hour work day, that Plaintiff retained an unlimited ability to operate hand and foot controls, and that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl.  (R. at 179.)  Dr. Bocian wrote that Plaintiff had no manipulative, visual, or communicative limitations, and that his only environmental limitation was that he should avoid concentrated exposure to heights, and concluded that the severity of Plaintiff's symptoms was disproportionate to Plaintiff's medically determinable impairments.  (R. at 182-183.)  Dr. Toner observed that Plaintiff's range of motion was inconsistent with his musculature and his x-raysand that Plaintiff was able to lift 25 to 30 pounds, stand and walk for four hours per day, and that there were no restrictions on Plaintiff's ability to sit and use his upper extremities. (R. at 150.)

57.     The record establishes that Plaintiff's daily activities were extensive and included washing cars, watering plants, taking his daughter to the park, going to church and taking care of his personal needs.  The Social Security Field Office interviewer recounted that Plaintiff appeared to be in pain during his interview, but that as Plaintiff walked to his car, he was walking better and faster.  (R. at 58.)  The interview observed that Plaintiff got into the drivers' side, even though he came with

23

his girlfriend, and that Plaintiff did not have any trouble getting into the car.  (*Id*.)  Plaintiff appeared

at the hearing wearing a back brace, yet the record contains no indication that any medical provider

advised Plaintiff to use a back brace.  Although there are reports within the record of Plaintiff's

complaints of pain, the objective medical evidence simply does not support such complaints to the

degree alleged.  Substantial evidence of record, both objective and subjective, supports that ALJ's

determination that Plaintiff retained the residual functional capacity for simple, non-public light work

activity with occasional postural limitations and avoidance of concentrated exposure to heights.

58.     Plaintiff argues that the ALJ erred in applying the Grids.  After determining that

Plaintiff was unable to perform his past relevant work, the ALJ proceeded to step five and found that

the Grids[23] directed a finding the Plaintiff was not disabled. (R. at 18-19.)  At step five, the burden

of proof shifts to the Commissioner to show that the claimant retains the residual functional capacity

to do work which exists in the national economy.  *Thompson v. Sullivan*, 987 F. 2d 1482, 1487 (10th

Cir. 1993).  In certain cases, at the fifth step, the ALJ may rely solely on the Grids.

59.     The Grids assume that a claimant's sole limitation is lack of strength, also known as

an exertional impairment.  *See* 20 C.F.R. Part 404, Subpt. P, App. 2, §200.00 (e)(2).  In a case such

as this, where a claimant presents evidence of both exertional and non-exertional impairments, the

ALJ must make findings on how much a claimant's work ability is further diminished by the non-

exertional limitations.  *Id.*  If the non-exertional limitations are significant enough to further reduce

work capacity, the ALJ may not rely solely on the Grids but must instead give full consideration to

all relevant facts, including expert vocational testimony if necessary, in order to determine whether

a claimant is disabled.  *See Channel v. Heckler*, 747 F. 2d 577, 583 (10th Cir. 1984).  In assessing

---

[23] 20 C.F.R. Part 404, Subpt. P, App. 2, §200.00 (e)(2).

the extent to which a claimant's ability to work is eroded by his non-exertional impairments, the ALJ will normally need to obtain the testimony of a vocational expert.  *See Hargis v. Sullivan*, 945 F. 2d 1482, 1491 (10th Cir. 1991).

60.     The ALJ consulted a vocational expert at the hearing and used the Grids as a framework at step five, after he determined that Plaintiff had the residual functional capacity for simple, non-public light work activity with occasional postural limitations and avoidance of concentrated exposure to heights.  (R. at 18-19.)  The ALJ may rely exclusively on the Grids when Plaintiff's non-exertional limitations do not significantly erode the occupational base.  *Gossett v. Bowen*, 862 F. 2d 802, 806 (10th Cir. 1988).  Additionally, the VE testified that even if Plaintiff could only stand or walk for four hours out of an eight hour day, he could still work as a laundry holder, laundry spotter, office helper, shipping and receiving layer, and jewelry preparer/sorter.  (R. at 298.)  Both the Grids and the testimony of the VE support the ALJ's determination at step five.

61.     The Commissioner's decision that Plaintiff is not disabled at step five is supported by substantial evidence and is in accordance with the law.

### RECOMMENDED DISPOSITION

I recommend that Plaintiff's Motion to Reverse and Remand (Doc. 6), filed July 8, 2002, be **DENIED**.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C).  Within ten days after a party is served with a copy of these proposed findings and recommendations that party may file with the Clerk of the District Court written objections to such proposed findings and recommendations.  A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are

filed, no appellate review will be allowed.

**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**